942 F.2d 617
 Richard ROTH; Richard Roth Productions, Plaintiffs-Appellants,
v.
Gabriel GARCIA MARQUEZ; Carmen Balcells, Defendants-Appellees.
Richard ROTH; Richard Roth Productions, Plaintiffs-Cross-Appellees,
v.
Gabriel GARCIA MARQUEZ; Carmen Balcells, Defendants-Cross-Appellants.
 Nos. 90-55713, 90-55751.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 7, 1991.
Decided Aug. 8, 1991.
 
 Maxwell M. Blecher, Blecher & Collins, Los Angeles, Cal., for plaintiffs-appellants.
 Dennis M. Perlus, Hufstedler, Kaus & Ettinger, Los Angeles, Cal., and Jay Cohen, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before D.W. NELSON, O'SCANNLAIN and TROTT, Circuit Judges.
 D.W. NELSON, Circuit Judge:
 
 
 1
 This case revolves around Richard Roth's and Richard Roth Productions' ("Roth") attempt to secure the movie rights to Gabriel Garcia Marquez' novel Love in the Time of Cholera. Roth appeals the district court's dismissal of his complaint for failure to state a claim and its denial of leave to amend. In addition, Garcia Marquez and agent Carmen Balcells appeal the district court's denial of their motion to dismiss for lack of personal jurisdiction. While none of these three issues is easily resolved, we initially affirm the district court's finding of personal jurisdiction. We also affirm the district court's dismissal for failure to state a claim and its denial of leave to amend. In sum, we are unwilling to grant through litigation what negotiation could not achieve.I. FACTUAL AND PROCEDURAL BACKGROUND
 
 
 2
 Appellant Richard Roth is a movie producer who lives in California and carries out his projects through Richard Roth Productions. Gabriel Garcia Marquez, an internationally renowned author who won the Nobel Prize for Literature in 1982, has written numerous bestselling novels. The film rights to his work Love in the Time of Cholera ("Cholera") are at issue in the present litigation. Garcia Marquez has resided in Mexico City for the last sixteen years. Carmen Balcells is the president of a literary agency headquartered in Barcelona, Spain. A resident of Barcelona, Balcells has been Garcia Marquez' literary agent for more than 25 years.
 
 
 3
 In late 1986, Roth contacted Garcia Marquez in Mexico City to express his interest in making a film based on Cholera. Roth flew to Havana, Cuba, to meet Garcia Marquez on this matter. Garcia Marquez told Roth that he would consider selling film rights under the following three conditions: 1) Roth would agree to pay him a large sum of money (later Balcells specified the sum of five million dollars); 2) Roth would agree to use a Latin American director; and 3) Roth would shoot the film in Colombia. Garcia Marquez later authorized Balcells to pursue negotiations with Roth.
 
 
 4
 Negotiations dragged on with disputes both about the price for the option and the identity of the possible director. Roth traveled a number of times to Barcelona and Mexico City to meet with Balcells and Garcia Marquez, and repeated calls, letters, and faxes passed between the parties. The only meetings that occurred in the United States were in May 1988, when Balcells traveled to California to attend an American Booksellers Association convention and met with Roth on the side, and in November 1988, when Garcia Marquez visited Los Angeles for four days at the social invitation of a friend. He met with Roth and agreed that Roth could shoot the film in Brazil, not Colombia, but he remained firm on the other two terms.
 
 
 5
 On November 17, 1988, the same day that Roth and Garcia Marquez met, Alan Schwartz, Roth's representative, faxed a letter to Balcells in Barcelona. The letter offered Garcia Marquez $200,000 for the grant of an option of two years on the film rights, the right to extend the option for another year for an additional $100,000, these monies to be applied against $1,250,000 to be paid when the option was exercised, $400,000 more on the release of the video, $350,000 more on the release of television showing, and 5% of the net profits of the film. On January 19, 1989, Schwartz telecopied another letter, which changed the first sum of $200,000 for the option to $400,000. The letter, which is the crux of this litigation, stated that the first paragraph of the November 17, 1988, letter was changed to the following:
 
 
 6
 (a) A payment of $400,000 for an option of two years to acquire the motion picture and allied rights to this novel. The option shall commence upon signature by Gabriel Garcia Marquez to the formal agreement and the return of said signed agreement to me or Richard Roth, at which time the option payment shall be made to you as agent for Gabriel Garcia Marquez.
 
 
 7
 The letter also stated: "On behalf of Richard Roth and myself I am very happy to confirm the final agreement between Richard and Gabriel Garcia Marquez ..." and "Please convey to Garcia Marquez the excitement Richard and I feel in being able finally to get this project moving." Balcells countersigned the letter and faxed back the following the next day:
 
 
 8
 Thank you for today's fax and I am happy that this deal is finally concluded.
 
 
 9
 I had no time to tell Gabo [Marquez] about this conclusion. In any case, I am returning your letter duly signed.
 
 
 10
 I shall await the formal agreement at your earliest convenience.
 
 
 11
 That same day, Roth wrote independently to Balcells thanking her "so much for concluding the deal" and telling her he was "putting the best champagne on ice so we can celebrate and drink it together."
 
 
 12
 In late February Schwartz transmitted the 25-page formal agreement to Balcells. Balcells objected to a number of points, particularly the omission of clauses about a Latin American director and the site of the shooting. Balcells communicated these objections, and weeks of renewed negotiations failed to produce an agreement. Garcia Marquez never signed the formal agreement, and the money was never paid him.
 
 
 13
 For personal jurisdiction analysis, Garcia Marquez lives in Mexico City and has never resided in California. He has visited the state four times for a total of twenty days. He met with Roth once in California, but entered the state for a social purpose. He has never owned property in the state, nor has he ever conducted business on a regular basis or authorized any resident of the state to do so on his behalf. He has maintained a checking account, not his principal one, in Los Angeles since 1988 for the purposes of having an account in dollars for certain transactions occurring outside of California.
 
 
 14
 Balcells lives in Barcelona. She has never lived in California, though she has visited twice. On one of those occasions, she met with Roth, though she was in the state for a convention. She has never owned property in California, has no office or telephone number there, and has never conducted business on a regular basis or authorized any resident of the state to do so for her.
 
 
 15
 In December 1989, Roth filed a complaint in district court seeking declaratory relief to determine the status of his rights to produce the film. Appellees filed a motion to dismiss, alleging both that the court lacked personal jurisdiction over each defendant and that because appellees had not entered into a binding contract, the complaint failed to state a claim upon which relief could be granted. The district court denied the motion to dismiss for lack of personal jurisdiction, but it granted the motion to dismiss for failure to state a claim. The district court also denied Roth's motion for leave to amend the complaint. Both sides now appeal the unfavorable ruling(s) against them.
 
 II. PERSONAL JURISDICTION
 
 16
 Appellees cross-appeal the district court's denial of their motion to dismiss for lack of personal jurisdiction. Neither Balcells nor Garcia Marquez may be haled into court, they contend, without offending due process.
 
 
 17
 We review de novo the denial of a motion to dismiss for lack of personal jurisdiction where the underlying facts are undisputed. FDIC v. British-American Ins. Co., 828 F.2d 1439, 1441 (9th Cir.1987).
 
 
 18
 The California long-arm statute provides that jurisdiction may be exercised over nonresident defendants "on any basis not inconsistent with the Constitution of this state or of the United States." Cal.Civ.Proc.Code § 410.10. Since California's jurisdictional statute is coextensive with federal due process requirements, the jurisdictional inquiries under state law and federal due process merge into one analysis. FDIC, 828 F.2d at 1441. The due process clause prohibits the exercise of jurisdiction over nonresident defendants unless those defendants have "minimum contacts" with the forum state so that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (internal quotation omitted).
 
 
 19
 We have interpreted International Shoe and its progeny as allowing jurisdiction by California courts over a nonresident defendant if he has enough continuous contacts with California to subject him to the court's general jurisdiction or if the specific cause of action arises out of a defendant's more limited contacts with the state so that California may exercise limited or specific jurisdiction over him. Data Disc v. Systems Technology Assoc., 557 F.2d 1280, 1287 (9th Cir.1977). Appellants concede that there is no general jurisdiction over appellees; the question, then, turns on whether the contacts in this case enable California to exercise limited jurisdiction over Balcells and Garcia Marquez. A three-part test has been articulated for limited jurisdiction: 1) the nonresident defendant must have purposefully availed himself of the privilege of conducting activities in the forum by some affirmative act or conduct; 2) plaintiff's claim must arise out of or result from the defendant's forum-related activities; and 3) exercise of jurisdiction must be reasonable. Shute v. Carnival Cruise Lines, 897 F.2d 377, 381 (9th Cir.1990) (emphasis added), rev'd on other grounds, --- U.S. ----, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); Sinatra v. National Enquirer, 854 F.2d 1191, 1195 (9th Cir.1988).
 
 A. Purposeful Availment
 As we explained in Sinatra:
 
 20
 Purposeful availment analysis examines whether the defendant's contacts with the forum are attributable to his own actions or are solely the actions of the plaintiff. In order to have purposefully availed oneself of conducting activities in the forum, the defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.
 
 
 21
 854 F.2d at 1195 (citations omitted). The Supreme Court has explained: "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person." Burger King v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (citations and internal quotations omitted).
 
 
 22
 It is important to distinguish contract from tort actions. For example, we have stated in a tort case that "within the rubric of 'purposeful availment' the Court has allowed the exercise of jurisdiction over a defendant whose only 'contact' with the forum state is the 'purposeful direction' of a foreign act having effect in the forum state." Haisten v. Grass Valley Medical Reimbursement Fund, 784 F.2d 1392, 1397 (9th Cir.1986) (citing Calder v. Jones, 465 U.S. 783, 789, 104 S.Ct. 1482, 1486-87, 79 L.Ed.2d 804 (1984)).
 
 
 23
 In the contract context, however, Burger King specifically noted that the existence of a contract with a resident of the forum state is insufficient by itself to create personal jurisdiction over the nonresident. 471 U.S. at 478, 105 S.Ct. at 2185; see also Gray & Co. v. Firstenberg Machinery Co., 913 F.2d 758, 760 (9th Cir.1990). Burger King stated that "with respect to interstate contractual obligations, we have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." 471 U.S. at 473, 105 S.Ct. at 2182 (quoting Travelers Health Ass'n v. Virginia, 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950)).
 
 
 24
 Appellees argue that because Roth initiated all the contacts and because he was the one who "reached out" to effect the contract, they should not be subject to California law. There was no solicitation of business by appellees, they maintain, that resulted in contract negotiations or the transaction of business. See Shute, 897 F.2d at 381; Sinatra, 854 F.2d at 1195. We have explained that "the purposeful availment analysis turns upon whether the defendant's contacts are attributable to 'actions by the defendant himself,' or conversely to the unilateral activity of another party." Hirsch v. Blue Cross, Blue Shield of Kansas City, 800 F.2d 1474, 1478 (9th Cir.1986) (quoting Burger King, 471 U.S. at 475, 105 S.Ct. at 2184) (emphasis in Burger King).
 
 
 25
 Here, it seems clear that the predominant efforts were made by the appellant, not the appellees. Roth traveled to Havana, Barcelona, and Mexico City in his peripatetic effort to secure the movie rights. Garcia Marquez and Balcells were in Los Angeles for other purposes when each met individually with Roth. While we concede that negotiations did take place at that time, it should be borne in mind that "temporary physical presence" in the forum does not suffice to confer personal jurisdiction. FDIC, 828 F.2d at 1443. Further, Roth and his agents placed over 100 calls and sent numerous faxes to the two appellees. "When a California business seeks out purchasers in other states ... [and] deals with them by out-of-state agents or by interstate mail and telephone, it is not entitled to force the customer to come to California to defend an action on the contract." Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica, 614 F.2d 1247, 1252 (9th Cir.1980) (quoting Interdyne Co. v. SYS Computer Corp., 31 Cal.App.3d 508, 510, 107 Cal.Rptr. 499 (1973)).
 
 
 26
 Roth also contends that the phone lines were used in the other direction--i.e., appellees made calls and returned letters and faxes to him. As this court held in Shute, "[M]any transactions take place solely by mail or wire across state lines, obviating the need for physical presence.... Thus, the Court has held that the physical absence of the defendant and the transaction from the forum cannot defeat the exercise of personal jurisdiction." Id. at 382. However, "[b]oth this court and the courts of California have concluded that ordinarily 'use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state.' " Peterson v. Kennedy, 771 F.2d 1244, 1262 (9th Cir.1985) (quoting Gonzalez, 614 F.2d at 1254) (footnote omitted); see also McGlinchy v. Shell Chem. Co., 845 F.2d 802, 816 (9th Cir.1988) (no jurisdiction where contract signed in forum because negotiated in England, and execution and termination conducted by mail).
 
 
 27
 There are two facts, then, that marginally work in appellees' favor: their minimal physical presence in the forum and the fact that it was appellant who made the sedulous efforts of solicitation. While this is a very close call, a final and broader issue appears to swing the first prong for Roth, namely the future consequences of the contract. See, e.g., FDIC, 828 F.2d at 1443 ("[t]he negotiations and contemplated future consequences of the contract ... must be considered"); Gray, 913 F.2d at 760 (" '[p]rior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' are the factors to be considered") (quoting Burger King, 471 U.S. at 479, 105 S.Ct. at 2185); Corporate Inv. Business Brokers v. Melcher, 824 F.2d 786, 789 (9th Cir.1987) ("[Burger King ] insisted that past and future consequences of the contractual arrangement involving a resident of the forum state be evaluated."); Hirsch, 800 F.2d at 1478 ("prong is satisfied when a defendant takes deliberate actions within the forum state or creates continuing obligations to forum residents"). The Burger King Court, in finding jurisdiction, emphasized that the Michigan franchisee defendant had entered into a relationship that "envisioned continuing and wide-reaching contacts with Burger King in Florida [the forum]." Burger King, 471 U.S. at 480, 105 S.Ct. at 2186.
 
 
 28
 The point here is simply that the contract concerned a film, most of the work for which would have been performed in California. Though the shooting most likely would have taken place in Brazil, all of the editing, production work, and advertising would have occurred in California. This is not an instance where the contract was a one-shot deal that was merely negotiated and signed by one party in the forum; on the contrary, most of the future of the contract would have centered on the forum. The checks that Roth would have sent Garcia Marquez, which appellees attempt to minimize, would have depended upon activities in California and the United States. In looking at the "economic reality," Haisten, 784 F.2d at 1398, it seems that the contract's subject would have continuing and extensive involvement with the forum.
 
 
 29
 Though neither side decisively triumphs under this analysis, it appears that there was enough purposeful availment here to compel a finding of jurisdiction on this prong.
 
 B. Arising Out of Forum-Related Activities
 
 30
 There is no dispute on this second prong, as appellees concede that appellant's claim arises out of the January 19 letter, which was negotiated and executed by a party who was in the forum at the time, namely Roth in Los Angeles.C. Reasonableness
 
 
 31
 The third prong asks whether the exercise of jurisdiction would be reasonable. Data Disc, 557 F.2d at 1287. We have set forth a congeries of factors to be considered in determining whether the exercise of jurisdiction over a nonresident defendant satisfies the reasonableness test: 1) the extent of the defendant's purposeful interjection into the forum state's affairs; 2) the burden on the defendant; 3) conflicts of law between the forum and defendant's home jurisdiction; 4) the forum's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the dispute; 6) the plaintiff's interest in convenient and effective relief; and 7) the existence of an alternative forum. Sinatra, 854 F.2d at 1199-1201; Insurance Co. of North America v. Marina Salina Cruz, 649 F.2d 1266, 1270 (9th Cir.1981) (first setting out factors). Since none of these factors is dispositive, we must balance the seven. FDIC, 828 F.2d at 1442.
 
 1. Extent of Purposeful Interjection
 
 32
 In light of the first prong of purposeful availment, analysis of this first factor in the third prong would be redundant. As we have concluded, albeit narrowly, that appellees purposefully availed themselves of the privilege of conducting activities in California, there is no need to analyze this first factor separately. Sinatra, 854 F.2d at 1199; Haisten, 784 F.2d at 1401.
 
 2. Burdens on Defendant
 
 33
 Appellees argue that because they are residents of foreign countries and speak different languages than English, requiring them to come defend a suit in California would impose a great burden. They cite Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987), for the proposition that a court should give "significant weight" to the "unique burdens" placed on a defendant that must defend in a foreign court. Appellant rejoins that "modern advances in communications and transportation have significantly reduced the burden of litigating in another country." Sinatra, 854 F.2d at 1199. Yet Sinatra specifically noted that "[t]he continuing contacts between the Clinic's United States-based agent and California translate into less of a litigation burden than if the Clinic maintained no physical presence or agent within the United States." Id. Here, neither appellee has an agent or office in the United States.
 
 
 34
 Roth argues that it would be no more burdensome for appellees to litigate here than for him to litigate in Mexico or Spain, and "this court 'must examine the burden on the defendant in light of the corresponding burden on the plaintiff.' " Shute, 897 F.2d at 386 (quoting Sinatra, 854 F.2d at 1199). This seems to be in conflict with language from FDIC, which states that "[t]he primary concern is for the defendant's burden." 828 F.2d at 1444. At bottom, because Roth had no problems in his globe-trotting endeavors to persuade Balcells and Garcia Marquez to sell the film rights to him, he should not complain that litigation outside the United States would be particularly onerous for him. Appellees have shown no similar propensity for travel. Although this factor cuts in favor of appellees, "[u]nless such inconvenience is so great as to constitute a deprivation of due process, it will not overcome clear justifications for the exercise of jurisdiction." Hirsch, 800 F.2d at 1481 (citing Burger King ). An examination of the other factors is thus required.
 
 
 35
 3. Extent of Conflict With Sovereignty of Foreign State
 
 
 36
 Appellees point the court to the language of Asahi: "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." Asahi, 480 U.S. at 115, 107 S.Ct. at 1034 (internal quotations omitted). In addition, "a foreign nation presents a higher sovereignty barrier than another state within the United States." FDIC, 828 F.2d at 1144. Nonetheless, "[t]he factor of conflict with the sovereignty of the defendant's state is not dispositive because, if given controlling weight, it would always prevent suit against a foreign national in a United States court." Sinatra, 854 F.2d at 1199 (internal quotations omitted). The Sinatra court found that the scales tipped for the plaintiff on this issue, but much of that was again based on the fact that the defendant had an agent in the United States, unlike appellees. In fact, Sinatra even distinguished FDIC on the grounds that there the defendant maintained no officer or affiliate in the United States. Id. at 1200. This factor, then, must line up on appellees' side.
 
 4. Forum State's Interest in Adjudication
 
 37
 Appellees argue that California has little interest in the outcome of a private contractual dispute. They distinguish torts, for which there is a strong public interest in redress of wrongs. Appellees even go so far as to say that assumption of jurisdiction where minimal contacts exist might have an adverse effect on commerce, since foreigners would be loathe to enter into contracts with Californians that might result in their being haled into foreign courts. Appellant states simply that any state has an interest in providing an effective means of redress for residents who have negotiated and executed contracts within the state. Of course, appellees remonstrate that their whole point is that this contract was neither negotiated--for the most part--nor executed in California.
 
 
 38
 Sinatra intones the bromide that California has a greater interest in protecting her residents than nonresidents who wish to sue in her courts. Id. at 1200. On the other hand, the preceding sentence's reference to a "strong interest" is in the tort context. Id. There is little case law in the contracts context in this circuit. One other case that appellees note is Floyd J. Harkness Co. v. Amezcua, 60 Cal.App.3d 687, 693, 131 Cal.Rptr. 667 (1976), where the state appellate court held that jurisdiction over a Mexican defendant was unreasonable because the forum state had little interest in the outcome of a dispute over performance under a contract.
 
 
 39
 In sum, this factor seems to be a toss-up, with perhaps a slight edge going to appellees.
 
 5. Most Efficient Judicial Resolution
 
 40
 This category, too, holds no edge for either party. Appellees live outside the United States, while appellant lives in California. Witnesses to the meetings in Mexico City, Havana, and Barcelona obviously live in foreign countries, while Roth's agents live in California. Though the film would be financed in California and would employ other Californians, these persons' testimony would not be relevant to whether a contract was formed; they would not be witnesses in this trial. Other cases in this circuit provide no guidance because of differing fact patterns. This factor is a push.
 
 
 41
 6. Convenience and Effectiveness of Relief for Plaintiff
 
 
 42
 Appellees dare not argue that it would be more convenient for Roth to litigate outside the United States. Nevertheless, they posit that because Roth was willing and able to pursue Balcells and Garcia Marquez by flying to different countries, he cannot now complain that it would be too inconvenient for him to return to the site of his solicitations in order to seek by litigation what he failed to achieve by negotiation. Both Shute and Sinatra stated that it would be more inconvenient for those plaintiffs to try cases outside the forum, but no doctorate in astrophysics is required to deduce that trying a case where one lives is almost always a plaintiff's preference. Both of the aforementioned cases can be distinguished from the present on the grounds that Sinatra never went to Switzerland to talk to the Clinic and the Shutes never traveled to Florida. Here, Roth did display an ability to meet and work in foreign countries. In all, this factor goes to Roth, but not as decisively as in other cases.
 
 7. Availability of an Alternative Forum
 
 43
 Alternative fora are Spain, where Balcells lives, and Mexico, where Garcia Marquez resides. While neither is decidedly a worse place than California to try the case, neither is demonstrably better. We have held that the plaintiff "bears the burden of proving the unavailability of an alternative forum." FDIC, 828 F.2d at 1445; Sinatra, 854 F.2d at 1201. In FDIC the court held that "[a]lthough [plaintiff] has argued that California would be a more convenient forum, it has not met its burden of proving that it would be precluded from suing [defendant] outside of California." FDIC, 828 F.2d at 1445. Here, Roth has not shown that he could not litigate in Spain or Mexico. Doubtless he would prefer not to, but that is not the test. Chalk this one up for appellees.
 
 8. Balancing the Seven Factors
 
 44
 Of the seven factors, then, the following two favor appellant: purposeful interjection and convenience for plaintiff. The following three tilt toward appellees: burden on defendant, conflict with sovereignty of another state, and availability of an alternative forum. Finally, two factors do not favor either side: forum state's interest and efficient judicial resolution. This is, in sum, an extremely close question.
 
 D. Weighing the Three Prongs
 
 45
 Appellant has narrowly satisfied the first prong, namely that appellees purposefully availed themselves of the privilege of conducting activities in the forum. He has also passed the second prong in that the claim arises out of appellees' forum-related activities. Garcia Marquez and Balcells, on the other hand, can make a strong argument on the third prong, namely that the exercise of jurisdiction may be unreasonable. Their difficulty, though, is in surmounting the following standard: "Once purposeful availment has been established, the forum's exercise of jurisdiction is presumptively reasonable. To rebut that presumption, a defendant 'must present a compelling case' that the exercise of jurisdiction would, in fact, be unreasonable." Shute, 897 F.2d at 386 (quoting Burger King, 471 U.S. at 476, 105 S.Ct. at 2184) (emphasis added); Sinatra, 854 F.2d at 1198 (burden then shifts to defendant to present compelling case). Appellees may be able to show that the exercise of jurisdiction might be unreasonable, but the closeness of the question manifests that they cannot do so in a compelling fashion. Because in the end appellees' showing does not surmount their hurdle, we find that personal jurisdiction does exist. We affirm the district court's denial of appellees' motion to dismiss.
 
 III. FAILURE TO STATE CLAIM
 
 46
 We review de novo an order dismissing a complaint for failure to state a claim. Massey v. Inland Boatmen's Union, 886 F.2d 1188, 1189 (9th Cir.1989).
 
 
 47
 The district court dismissed appellant's complaint on the grounds that Roth had not stated a claim upon which relief could be granted under Fed.R.Civ.P. 12(b)(6). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). The question, therefore, is whether or not Roth could prove facts that would support his interpretation that the parties intended the January 19, 1989, agreement to constitute a binding contract.[1]
 
 
 48
 Appellant argues that the language in Schwartz' January 19 fax that he was "confirm[ing] the final agreement between Richard and Gabriel Garcia Marquez," Balcells' response that she was "happy that this deal is finally concluded," and Roth's letter thanking Balcells "for concluding the deal" all prove that the parties intended the January 19 letter to be a binding contract. The long-form agreement, appellant maintains, was merely boilerplate required by the studios.
 
 
 49
 Appellees rejoin that the letter was but an agreement to make an agreement in the future, an expression of intent to negotiate a contract that would be signed by Garcia Marquez. They note that language saying that "[t]he option shall commence upon signature by Gabriel Garcia Marquez to the formal agreement and the return of said signed agreement" demonstrates that his signature was a condition precedent to the forming of a binding contract. Since he never signed, no contract was formed. Further, appellees argue that because the January 19 letter only discusses price, several essential terms, including shooting location and nationality of the director, were omitted, thus rendering the contract invalid.
 
 A. Condition Precedent
 
 50
 A fundamental premise of California--or any contract--law is that courts must look at the intent of the parties:
 
 
 51
 It is, of course, elementary that a writing which is intended by the parties to be a mere memorandum of intention to negotiate a contract and which does not purport to state the essentials of a proposed agreement is unenforceable. Whether the writing which is before us should be construed as a complete agreement or only as a memorandum which left essentials to future negotiations was to be decided in accordance with the ascertained intentions of the parties.
 
 
 52
 Carter v. Milestone, 170 Cal.App.2d 189, 193, 338 P.2d 569 (1959) (internal citation omitted). Roth argues that Schwartz stated in his affidavit that the reference to Garcia Marquez' signature was meant solely to fix the date on which the first $400,000 payment was to be made and to set the starting date for the running of the two-year option period. Appellees respond that the pellucid language of the writing shows that nothing was binding until Garcia Marquez signed.
 
 
 53
 Witkin notes that "if the evidence shows that the signatures of other parties were required as one of the conditions of the completed agreement, it is incomplete and not binding upon those who sign until the others sign." 1 B. Witkin, Summary of California Law, Contracts § 143 (9th ed. 1987). This language is echoed in Santa Clara-San Benito Chapter of the Nat'l Elec. Contractors Ass'n v. Local Union No. 332, 40 Cal.App.3d 431, 436, 114 Cal.Rptr. 909 (1974): "When ... two parties execute a contract with the understanding that the approval of a third party is necessary for the agreement to take effect, the contract is not complete until the third party has approved. Until that happens neither party is bound by the agreement."
 
 
 54
 The closest factual parallel may be found in Los Angeles Rams Football Club v. Cannon, 185 F.Supp. 717 (S.D.Cal.1960), in which LSU star Billy Cannon signed a contract with the Rams before his last college game. When wooed with a richer deal by the upstart AFL's Houston Oilers, Cannon sought to escape from his Rams deal. The court held that because the contract contained the following language: "This agreement shall become valid and binding upon each party hereto only when, as and if it shall be approved by the Commissioner," id. at 721, the Commissioner's failure to sign rendered the contract unenforceable. The court held that such language "is too definite to be ignored. It jumps out at you. The words employed are too strong to permit of ambiguity. Their selection was obviously made with great care so that there would be no dispute about their meaning." Id. at 722.
 
 
 55
 Roth attempts to distinguish such a condition precedent by saying that the Cannon contract contained the words "only when, as and if." We agree, however, with appellees that these are not a required magical incantation. Roth's argument about the signature merely triggering the payment date is simply too flimsy to stand in the face of such a clear condition precedent. Garcia Marquez' signature was required for the contract to be binding. Finally, appellant can provide no case for the court in which the later required signing of a contract was held to mark something other than a condition precedent.
 
 B. Exclusion of Essential Terms
 
 56
 Even if we believed that Garcia Marquez' signature was not a condition precedent, we must also be satisfied that all essential terms were included in the contract. We agree that it is not enough for appellees to argue that the long-form contract was not signed, because "[w]here all of the essential terms of an agreement are definitely agreed upon in the writing[,] there is a binding contract even though there is an intention that a formal writing will be executed later." Smissaert v. Chiodo, 163 Cal.App.2d 827, 830, 330 P.2d 98 (1958); see also 1 Witkin § 136 ("[preliminary] negotiations ordinarily result in a binding contract when all of the terms are definitely understood, even though the parties intended that a formal writing embodying these terms shall be executed later").
 
 
 57
 On the other hand, we have held that "[i]f an essential element of a promise is reserved for future agreement by both parties there is no legal obligation until such future agreement is made." If the term is not essential, then the contract will be deemed binding. Hotel del Coronado Corp. v. Foodservice Equip., 783 F.2d 1323, 1325 (9th Cir.1986); see also Jackson v. Grant, 890 F.2d 118, 120 (9th Cir.1989) ("If an essential element of the contract is reserved for the future agreement of both parties, there is generally no legal obligation created until such an agreement is entered into."); 1 Witkin § 156 ("A contract which leaves an essential element for future agreement of the parties is usually held fatally uncertain and unenforceable."). "Whether a term is essential depends upon the relative importance and the severability of the matter left to the future; it is a question of degree.... The importance of a term may depend in part on the intentions of the parties." Coronado, 783 F.2d at 1325 (internal quotations and citations omitted).
 
 
 58
 The issue thus boils down to whether or not the letters of January 19 and November 17 set out the essential terms of the agreement. The terms they do set out are the following: 1) price for option rights; 2) price for extension of rights; 3) price for exercising option; 4) further payment on release of video; 5) further payment on television release; and 6) percentage of net profits. All of these terms, at bottom, concern price. Yet the other two critical terms--where the film would be shot and who would direct it--were not in this agreement. In fact, they were absent from the long-form agreement as well, which seems to be a major reason why it was never signed. In addition, Balcells objected to a number of other points, including assignability and scope of the rights being transferred to Roth.
 
 
 59
 The closest fact situation occurs in Carter, where a California appellate court held that no binding contract existed between a producer and the writer of a screenplay. The writing at issue stated in the first sentence: "The signatures of the parties below will indicate that this is the general understanding under which formal contracts will be prepared." 170 Cal.App.2d at 192 n. 1, 338 P.2d 569. The writing went on to detail seven different terms including setting up of the company, price to be paid, and option length. The detail, it should be mentioned, was more comprehensive than it is in this case. Paragraph 6 stated: "The parties agree that the form of formal contract to be entered into will be the standard form of motion picture production contract and shall contain all of the rights usually contained therein...." Id. The court held that the writing was not intended to be binding. It affirmed the district court's finding that " '[t]here is no such thing as a standard form of motion picture production contract. Such contracts generally run from seventy to ninety pages and each of the terms of such contracts can and do vary.' " Id. at 195, 338 P.2d 569 (quoting district court). Though contracts may be more standardized now than 30 years ago, there were still many items to be worked out between the parties here. Specifically, the nature and scope of rights transferred had not been adequately delineated. We agree with the district court that because all of the essential terms were not set out, no binding contract existed.
 
 
 60
 Because we find as a matter of law both that essential terms were missing and a condition precedent was unfulfilled, we affirm the district court's dismissal for failure to state a claim.
 
 IV. LEAVE TO AMEND
 
 61
 Federal Rule of Civil Procedure 15(a) deals with amendments to pleadings. Once a responsive pleading has been filed, as is the case here, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Id. A district court's denial of such leave to amend is reviewed under an abuse of discretion standard. United States v. Pend Oreille Public Utility Dist. No. 1, 926 F.2d 1502, 1511 (9th Cir.1991) (citing Hurn v. Retirement Fund Trust, 648 F.2d 1252, 1254 (9th Cir.1981)). "In exercising this discretion, a court must be guided by the underlying purpose of Rule 15--to facilitate decision on the merits, rather than on the pleadings or technicalities." United States v. Webb, 655 F.2d 977, 979 (9th Cir.1981). Further, "Rule 15's policy of favoring amendments to pleadings should be applied with 'extreme liberality.' " Id., quoted in DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir.1987).
 
 
 62
 "Four factors are commonly used to determine the propriety of a motion for leave to amend. These are: bad faith, undue delay, prejudice to the opposing party, and futility of amendment." DCD Programs, 833 F.2d at 186; see also Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (identifying these factors that later became the test). In this case there is no doubt that delay, bad faith, and prejudice are not involved. Whether leave to amend should have been granted hinges on the futility of amendment. Roth argues that he could have pleaded with greater specificity that both parties intended the January 19 letter to be a binding contract. Appellees, however, have convinced us that the plain language of the letter, which required Garcia Marquez' signature and failed to include essential terms, and the existence of the long-form agreement vitiate whatever else appellant could bring up in an amended complaint.
 
 
 63
 Appellant also points to a number of cases that require written findings by the district court explaining why amendment would be futile. For example, we have held that "a denial without stated reasons, where the reasons are not readily apparent, constitutes an abuse of discretion." Hurn, 648 F.2d at 1254. In Webb we stated: "In the absence of some statement of reasons or findings of fact showing bad faith or prejudice, we cannot determine whether it was an abuse of discretion to deny Webb's motion for leave to amend his pleadings." 655 F.2d at 980; see also Klamath-Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau, 701 F.2d 1276, 1292-93 (9th Cir.1983) ("where the record does not clearly dictate the district court's denial, we have been unwilling to affirm absent written findings, and have reversed findings that were merely conclusory") (citations omitted), cert. denied, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983); DCD Programs, 833 F.2d at 186.
 
 
 64
 Despite this strong language, we can cite an equal number of cases holding that where the reason for denial is apparent, the district court need not state reasons. The sentence following the one quoted above in Klamath-Lake says: "At the same time, futile amendments should not be permitted." Id., quoted in DCD Programs, 833 F.2d at 188. In Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1319 (9th Cir.1984), we held that since the "reasons for denial are readily apparent," the district court did not abuse its discretion. See also Ascon Properties, 866 F.2d at 1160 (reasons readily apparent). In Johnson v. American Airlines, Inc., 834 F.2d 721 (9th Cir.1987), we denied leave to amend, stating that "courts have discretion to deny leave to amend a complaint for 'futility,' and futility includes the inevitability of a claim's defeat on summary judgment." Id. at 724 (citations omitted); see also Gabrielson v. Montgomery Ward & Co., 785 F.2d 762, 766 (9th Cir.1986) ("any amendment would have been futile in that it could be defeated on a motion for summary judgment").
 
 
 65
 In many of the cases appellant cites, where we reversed a district court's refusal to permit amendment, the plaintiffs wished to add defendants or entirely separate claims. See, e.g., Hurn, 648 F.2d at 1254 (plaintiff wished to amend in order to allege claim under different statute); Webb, 655 F.2d at 979 (to allege different type of claim); DCD Programs, 833 F.2d at 184 (to add a new defendant); but see id. at 186 ("liberality in granting leave to amend is not dependent on whether the amendment will add causes of action or parties"). Here, Roth simply wishes to plead more specifically. The district court has already considered Roth's claim that a contract existed, and it read the declarations of Roth and Schwartz. While it may be preferable that reasons be stated on the record, it seems fairly obvious that denial was based on the futility of amendment. Though we do not lightly affirm a denial of leave to amend, it is difficult to argue that the district court abused its discretion in the instant case. Were amendment allowed, the claim would certainly be defeated at summary judgment. See Johnson, 834 F.2d at 724; Gabrielson, 785 F.2d at 766. In sum, because appellant's argument ultimately founders on the high deference owed the district court, we affirm the district court's denial of leave to amend.
 
 V. CONCLUSION
 
 66
 We affirm the district court's finding that personal jurisdiction existed as to the appellees. We also affirm the district court's dismissal and denial of leave to amend because no contract existed between the parties as a result of the January 19 letter and amendment could not show otherwise.
 
 
 67
 AFFIRMED.
 
 
 68
 O'SCANNLAIN, Circuit Judge, specially concurring:
 
 
 69
 I concur in the result and in Parts I, III, and IV of the court's opinion. In light of our resolution of the issues raised on appeal by Roth, I would dismiss the cross-appeal and therefore not reach the challenge to the district court's exercise of personal jurisdiction over Garcia Marquez and Balcells.
 
 
 
 [1]
 In general, "[w]e must accept material allegations in the complaint as true and construe them in the light most favorable to the appellant." Cooke, Perkiss & Liehe v. Northern California Collection Serv., 911 F.2d 242, 244 (9th Cir.1990) (citing Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1152 (9th Cir.1989)). However, "[i]f a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint. These documents are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of the claim." Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir.1987), cert. denied, 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987) (citing Amfac Mortgage Corp. v. Arizona Mall of Tempe, 583 F.2d 426, 429-30 (9th Cir.1978)). Moreover, when the allegations of the complaint are refuted by an attached document, the Court need not accept the allegations as being true. Ott v. Home Savings & Loan Ass'n, 265 F.2d 643, 646 n. 1 (9th Cir.1958). In this case, the documents were indeed attached to the complaint; we may thus consider them