51 F.3d 282
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Dennis RICHARDSON, dba, Crown Partners, Plaintiff-Appellant,
v.
HARBOUR GROUP INDUSTRIES INC., Defendant-Appellee.
 No. 93-55898.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 6, 1995.
Decided March 29, 1995.
 
 1
 Before: BRUNETTI and KOZINSKI, Circuit Judges, and SHADUR, District Judge.*
 
 
 2
 MEMORANDUM**
 
 
 3
 The district court properly dismissed Richardson's claim because Richardson failed to satisfy the first prong of the three-part test for specific personal jurisdiction: Richardson has not shown that HGI purposefully availed itself of the privilege of conducting activities in California. See, e.g., Roth v. Garcia Marquez, 942 F.2d 617, 620-621 (9th Cir.1991) (describing three-part test).
 
 
 4
 To determine whether HGI purposefully availed itself of the privilege of conducting activities in California, we consider the (a) negotiations and (b) contemplated future consequences of the contract. FDIC v. British-American Ins. Co., 828 F.2d 1439, 1443 (9th Cir.1987). When Richardson called Lobdell about the prospect of HGI's selling its cutting tool operations, Lobdell encouraged Richardson to contact Robinson about presenting acquisition candidates to HGI. ER 21-22.
 
 
 5
 But, while HGI's role in the formation of a relationship may have been active enough to sustain a finding of purposeful availment, see Roth, 942 F.2d at 621-22, the Fee Agreement did not specifically contemplate conducting business in California. See id. at 622 (finding purposeful availment where most of subject of contract was work to be done in California); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 480 (1985) (Michigan franchisee defendant subject to personal jurisdiction in Florida because it had entered into relationship that "envisioned continuing and wide-reaching contacts with Burger King in Florida"). The Fee Agreement did not obligate Richardson to do any work, much less work in California. As in McGlinchy v. Shell Chem. Co., 845 F.2d 802 (9th Cir.1988), no "terms in the contract ... indicate that [the defendant] contemplated an effect in California, much less that any such effect should be considered a material term of agreement." Id. at 817. The Fee Agreement, like the contract in McGlinchy, "makes no reference to California, to [Richardson's] residence in California, or to any reliance on [Richardson's] facilities in California." Id.; see ER 11-13 (Fee Agreement). Nor did the fee agreement or HGI's subsequent correspondence with Richardson specifically request that Richardson research acquisition candidates doing business in California. Indeed, of 85 candidates he submitted, only 9 were located in California. ER 23-24, 66-78. The two candidates for which he now claims a commission were Delaware corporations, with principal places of business in Florida and Delaware. Cf. Colmen Fin. Servs. v. Charter Equip. Leasing Corp., 708 F.Supp. 664 (E.D.Pa.1989) (California corporation not subject to specific jurisdiction under Pennsylvania law because plaintiff broker was expected to conduct nationwide search, rather than to concentrate on the Pennsylvania market). The agreement did not even specify that Richardson be paid in California: Richardson requested that any commission he earned be paid to a Nevada corporation.
 
 
 6
 Finally, it does not matter that Richardson did "virtually all activities in connection with [his] fee agreement ... in California." ER 26. The mere fact that the plaintiff performs the contract in California cannot serve as a basis for jurisdiction over the defendant, which turns on the latter's activity. McGlinchy, 845 F.2d at 816 (rejecting attempt to predicate jurisdiction on the fact that plaintiffs "performed 90% of [their] activities in [California]").
 
 
 7
 Because the fee agreement did not contemplate an effect in California, HGI did not interject itself in California in a "calculated effort ... to conduct business in California," FDIC, 828 F.2d at 1443, and therefore did not purposefully avail itself of the forum.
 
 
 8
 AFFIRMED.
 
 
 9
 SHADUR, Senior District Judge, dissenting.
 
 
 10
 Though the proper outcome here does seem clear to me, I certainly recognize that this case provides ample room for disagreement--it aptly illustrates the analytical process so lucidly described in Edward Levi's Introduction to Legal Reasoning (1949). As that near-classic work demonstrates, each side in a later case seeks to explain the ratio decidendi of earlier authorities by emphasizing the perceived similarities and discounting the dissimilarities of the cases that are advanced as precedents for the decision reached in the current case. With all respect for the majority's different conclusion, I view the controlling authorities as calling for Harbour Group Industries, Inc. ("Harbour") to respond in a California federal forum.
 
 
 11
 Two Supreme Court decisions in particular point the way to that conclusion: Burger King v. Rudzewicz, 471 U.S. 462 (1985) and the earlier decision in Calder v. Jones, 465 U.S. 783 (1984).[1] Although the unanimous opinion in Calder dealth with a tort rather than a contract action, its emphasis on the known effects of a defendant's activity directed into the forum (465 U.S. at 783) carries force in the breach-of-contract context as well--as Calder, id. at 790 put it succinctly:
 
 
 12
 An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.
 
 
 13
 Indeed, the contract-based opinion in Burger King expressly drew on Calder at several points, as for example at 471 U.S. at 476:
 
 
 14
 So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.
 
 
 15
 Though I will return to Burger King at some length a bit later, two non-issues should be put to one side before the true substantive issues are dealt with. Even though the parties have addressed those non-issues as if they mattered, and even though those matters would point in opposite directions if they were relevant, only a moment's thought is needed to demonstrate the irrelevance of each:
 
 
 16
 1. It really does not matter that the first contact of any kind between Dennis Richardson ("Richardson") and Harbour came when Richardson inquired about Harbour's possible willingness to consider the sale of one facet of its business holdings. That preliminary contact, which ultimately led to a formal contractual relationship between the parties, is of no more significance than it would have been if the principals had first met at a country club in Houston or at a Rotary International meeting in Omaha. Because in this case we are looking at specific jurisdiction and not general jurisdiction, what properly forms the grist for the jurisdictional mill is the immediate background that led to the particular transactions in suit and the course of events involving those transactions.
 
 
 17
 2. On the other side of the coin, no weight should attach to the meeting that took place in California in February 1992 between Richardson and Harbour's acquisition man Wayne Robinson ("Robinson"), a meeting that occurred when Robinson was already required to be in California on other business and that did not focus on the transactions at issue.
 
 
 18
 But what is both relevant and material is the nature of the parties' business and of the transactions in suit. Burger King counsels an analysis that makes that plain--an analysis that bears quotation at length (but skipping citations) so that its conceptual basis is not lost sight of in favor of any convenient shorthand phrases (471 U.S. at 475-77, 478-79):
 
 
 19
 This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or a third person." Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.
 
 
 20
 Jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.
 
 
 21
 Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." Thus courts in "appropriate case[s]" may evaluate "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies." These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 At the outset, we note a continued division among lower courts respecting whether and to what extent a contract can constitute a "contact" for purposes of due process analysis. If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot. The Court long ago rejected the notion that personal jurisdiction might turn on "mechanical" tests, or on "conceptualistic ... theories of the place of contracting or of performance." Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors--prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing--that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.
 
 
 25
 Here Harbour's whole business is the acquisition of other businesses, an activity that it pursues constantly and aggressively. It engages in that activity everywhere, including the ongoing and repeated active solicitation of persons such as Richardson to present it with prospective deals. Richardson's whole business is that of business-finder or broker--an activity that from its very nature is not limited to producing California-based prospects, for the contacts that a California-based finder has around the country derive from Burger King's "inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines."
 
 
 26
 But let us look at what Harbour did here, for the cases properly emphasize that the unilateral activity of a resident of the forum (in this instance Richardson) cannot alone draw the nonresident (in this instance Harbour) into the forum to defend a lawsuit. Both before and after the drafting and execution of the Fee Agreement evolved out of the parties' original discussions about what Richardson could do to assist Harbour in attaining its expansive acquisition goals, Richardson began to submit a substantial number of prospects for Harbour's consideration. And under the Fee Agreement Harbour agreed to pay a finder's fee on any transaction that it consummated with a party introduced by Richardson.[2]
 
 
 27
 However, the controlling factor is not Richardson's pattern of submissions, but rather that Harbour was not at all a passive recipient of those submissions. Over a two-year period Robinson and other Harbour executives wrote Richardson in California some 13 "Dear Dennis" letters in which Harbour actively solicited and resolicited Richardson's efforts on Harbour's behalf. In each instance Harbour emphasized its special capabilities as an aggressive acquirer because (as it said in one variation of its repeated message in that respect) it "is one of the few buyers who can (and continues to) close deals because financing is not a problem." Its importuning of Richardson sounded a regular refrain (here are a few excerpts from some of its letters):
 
 
 28
 We realize that there are fewer "gems" in the market today than in years past. As a result, we are redoubling our efforts to find them. To that end, I enclose a summary of our acquisition criteria. We want to close on at least two more companies before year-end, but to do that we need your help. If you find a "gem" that fits our criteria, please send it our way.
 
 
 29
 * * *
 
 
 30
 * * *
 
 
 31
 With our mezzanine fund and equity pool, Harbour Group is in strong position as we begin 1991. We continue to make offers with no financing contingencies. With sellers and buyers becoming more rational, we expect 1991 to be a good year.
 
 
 32
 That said, we still need your help in finding quality deals. From the survey I sent to you last year, I have a few ideas of ways Harbour Group might help you in the effort. I would like to offer one now.
 
 
 33
 * * *
 
 
 34
 * * *
 
 
 35
 Harbour Group is eager to review situations such as these because we bring operating experience to these situations. Cash alone will not do it. These companies need leadership to help them become strong again.
 
 
 36
 Of course, we continue to search for strong performers who are not overlevered, but we are also aggressive buyers of companies that were once strong but currently have too much debt. When you run across either of these types of situations, we would be eager to review them.
 
 
 37
 As always, I appreciate your help in finding opportunities for Harbour Group, and hope we have a chance to talk soon.
 
 
 38
 It is frankly difficult to imagine a better example of non-random, non-fortuitous, but rather deliberate and continuing, "purposeful availment" by Harbour of a California-based source in the commercial-reality sense that is taught by Burger King. Burger King is only one of the long string of Supreme Court decisions that stress the critical importance of reasonable foreseeability: "that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there" (471 U.S. at 474, quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). Here Harbour injected itself into California again and again by inviting California resident Richardson to submit prospective targets for acquisition. It has to strike any businessman as anomalous that such an aggressive company with far-flung operations, after constantly sending such invitations into California, can insist that the California invitee who has delivered as requested must go into Missouri--where the invitee has never ventured--in order to collect the fees earned from his responses to Harbour's invitations. In candor, Harbour's disclaimer of that eminently reasonable foreseeability must be viewed as disingenuous. Courts should be no less commonsensical.
 
 
 39
 This is not at all to disavow what this Court said and did in McGlinchy v. Shell Chem. Col, 845 F.2d 802 (9th Cir.1988). Quite to the contrary, the contract on which plaintiffs sued in that case expressly called for their services to be rendered in facilitating the "sale and promotion of PB Resin in Africa and the Middle East" (id. at 805). Nothing in that case showed either "substantial" or "continuous and systematic" activities in California by the targeted defendant, Shell International Chemical Company (id. at 815). Instead the only defendant's conduct on which plaintiffs relied as a potential jurisdictional hook was the signing of a contract in California--a contract that had been negotiated elsewhere, but that simply had pen put to paper in the forum state. Merely to lay that factual scenario alongside the one in this case seems to me to demonstrate a total contrast--to show why the particulars of McGlinchy are wholly inapropos to this case and why the seminal teaching of Burger King and Calder dictates a different result here.
 
 
 40
 Accordingly I respectfully dissent.
 
 
 
 *
 The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Because California has chosen to have its jurisdictional long-arm extend to the full reach of the Due Process Clause (Cal.Civ.Proc.Code Sec. 410.10), the substantive discussion need not depart from the constitutional teachings of the United States Supreme Court. Roth v. Garcia Marquez, 942 F.2d 617, 620 (9th Cir.1991)
 
 
 [2]
 As is typical in such transactions, the fee was to be based on a percentage of the purchase price of each acquisition: 2% of the first $25 million of purchase price and 1% of any excess