Elaine ROSENBERG and Micheline Nanette Sinclair, Plaintiffs,

v.

The SEATTLE ART MUSEUM, Defendant and Third Party Plaintiff,

v.

Knoedler–Modarco, Inc., Third–Party Defendant.

No. C98–1073L.

United States District Court, W.D. Washington, at Seattle.

March 29, 1999.

Camden M. Hall, Foster Pepper & Shefelman, Seattle, WA, Andrew M. Dansicker, Laura B. Hoguet, Hoguet Newman & Regal, New York City, for Elaine Rosenberg, Micheline Nanette Sinclair.

Stuart R. Dunwoody, John Alan Reed, Jessica L. Goldman, Davis Wright Tremaine LLP, Seattle, WA, for Seattle Art Museum.

Timothy G. Fielden, Michael B. Rodden, Stoel, Rives, Boley, Jones & Grey, Seattle, WA, Sara Goldberg, Lewis R. Clayton, Daniel Leffell, Paul Weiss Rifkind Wharton & Garrison, New York City, for Knoedler–Modarco Inc.

## ORDER DENYING KNOEDLER–MODARCO, INC.'S MOTION TO DISMISS THE AMENDED THIRD–PARTY COMPLAINT FOR LACK OF PERSONAL JURISDICTION

LASNIK, District Judge.

This matter comes before the Court on the Motion of Third–Party Defendant Knoedler–Modarco, Inc. ("Knoedler") to Dismiss the Amended Third–Party Complaint for Lack of Personal Jurisdiction. This litigation arises out of allegations that the Seattle Art Museum ("SAM") is in possession of a 1928 Matisse called "L'Odalisque" that was apparently looted by the Nazis during or around the time of World War II. The daughter and daughter-in-law of Paul Rosenberg, the Paris art dealer who apparently owned L'Odalisque

at the time of its theft, have sued SAM to recover the painting.

SAM took possession of L'Odalisque in 1991 through a bequest in the will of Mrs. Virginia Bloedel ("Jinny") and a trust established by her husband, Mr. Prentice Bloedel ("Bing"). SAM obtained full ownership of the painting upon Bing's death in 1996. The Bloedels, in turn, had purchased L'Odalisque from third-party defendant Knoedler–Modarco, Inc. (or its corporate predecessor) in 1954.

## FACTS RELATED TO THE JURISDICTIONAL ANALYSIS

In the summer of 1952, Knoedler, a New York art gallery, proposed that Jinny and Bing's daughter, Virginia Bloedel Wright ("Virginia"), act as its agent in organizing an exhibition and sale of its art in Seattle. Virginia had been working at another gallery in New York and had become acquainted with Lelia Wittler ("Lelia"), an employee of Knoedler. It is not clear from the record whether Jinny and Bing had had any contact with Knoedler or Lelia prior to the summer of 1952 or whether their introduction came through Virginia. Jinny and Bing purchased two drawings from Knoedler as a result of the sale Virginia hosted.

Following the Seattle sale, Knoedler contacted the Bloedels directly on at least two occasions regarding other paintings. It appears that no purchase was consummated as a result of these contacts.

In August and September of 1954, the Bloedels were in New York to be with Virginia when she gave birth to twins. The twins were late, and, according to Virginia, her parents spent their time "shopping" at Knoedler's gallery, where they found L'Odalisque and reached an agreement to have it sent to their home on Bainbridge Island. It is not clear whether the Bloedels were in New York or in Washington when Knoedler typed up a "consignment" agreement on 9/28/54, but the result was that the Matisse was shipped to Washington to give the Bloedels time to evaluate it in their home. Lelia wrote the Bloedels twice regarding the Matisse, passing along information and prodding them for a decision. Eventually, the Bloedels approved the sale and it was finalized.

On November 11, 1954, Knoedler typed up a bill of sale transferring ownership of L'Odalisque to the Bloedels in exchange for $19,000. At some point shortly thereafter, Jinny must have expressed some concern regarding the Matisse because Lelia wrote a letter on 12/21/54 detailing the artist's ownership and exhibitions of L'Odalisque in 1937 and 1938. For whatever reason, the facts set forth in that letter were false, despite the fact that Knoedler apparently had the correct information in its possession at the time the letter was written. SAM alleges fraud and/or negligent misrepresentation arising out of this letter.[1]

On numerous occasions thereafter, Knoedler contacted the Bloedels in an effort to interest them in additional pieces of art. Representatives of Knoedler made at least two trips to Washington to visit the Bloedels, on the heels of which came more offers to sell or consign art.

The only other fact of jurisdictional significance is that Knoedler advertised in national art magazines in the early 1950's. These magazines were aimed at potential clients just like the Bloedels. There is no evidence that the Bloedels ever subscribed or otherwise saw these advertisements.

## DISCUSSION[2]

■ "The district court's determination of a party's amenability to suit is made by

---

1. It appears that Lelia also forwarded a book on Matisse to the Bloedels: there is a handwritten note from Jinny thanking her for both the book and the "letter about the previous owner of my Matisse."

2. SAM has not alleged that Knoedler has sufficient contacts to trigger this Court's general jurisdiction. The following discussion, therefore, considers whether the exercise of specific jurisdiction over Knoedler is appropriate.

reference to the law of the state in which it sits." *Peterson v. Kennedy,* 771 F.2d 1244, 1262 n. 12 (9th Cir.1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). Washington's long arm statute, RCW 4.28.185, provides six separate bases for the exercise of jurisdiction, only two of which are applicable here: (1) the "transaction of any business within this state" and (2) the "commission of a tortious act within this state." Despite the rather narrow terms of the statute, the Washington Supreme Court has held that the state's long-arm statute "extends jurisdiction to the limit of federal due process." *Shute v. Carnival Cruise Lines,* 113 Wash.2d 763, 771, 783 P.2d 78 (1989). Thus, the Ninth's Circuit's jurisdictional analysis governs:

> (1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws[;] (2)[t]he claim must be one which arises out of or results from the defendant's forum-related activities[; and] (3)[e]xercise of jurisdiction must be reasonable.

*Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267 (9th Cir .1995) (citing *Data Disc, Inc. v. Systems Tech. Associates, Inc.,* 557 F.2d 1280, 1287 (9th Cir. 1977)).

 SAM has alleged both contract and tort claims against Knoedler. Because this motion is being decided on the affidavits and discovery materials, SAM's burden is to establish a prima facie showing of in personam jurisdiction over Knoedler for each of its claims. *See Data Disc,* 557 F.2d at 1288 n. 8. The Ninth Circuit has noted:

> The purposeful availment requirement ensures that defendants will not be haled into a jurisdiction through random, fortuitous, or attenuated contacts. Although there is some disagreement on the issue, we apply different purposeful availment tests to contract and tort cases. Consistent with the Supreme Court's holding in *Burger King [Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ], merely contracting with a resident of the forum state is insufficient to confer specific jurisdiction over a nonresident. In tort cases, however, jurisdiction may attach if an out-of-forum defendant merely engages in conduct aimed at, and having effect in, the situs state.

*Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995) (citations and internal quotations omitted). SAM's contract and tort claims are considered separately below.

### A. Contract Claims

SAM asserts that Knoedler affirmatively solicited the Bloedels' business in Washington through its national advertising campaign and its personal contacts with the Bloedels, that Knoedler consigned L'Odalisque to the Bloedels in Washington with the expectation that some future action, either acceptance/payment or rejection/return, would occur there, and that Knoedler knew it was negotiating and contracting with Washington residents. Knoedler points out that it was the Bloedels who initiated the transaction at issue here and that, upon completion of the sale, no further performance was required by either side. The Court has considered each of Knoedler's alleged contacts with the forum, separately and combined, to determine whether Knoedler purposefully availed itself of the benefits and protections of Washington law when it contracted with the Bloedels in 1954.

### 1. Solicitation of Business

 Solicitation of business within the forum "will generally be considered purposeful availment if that solicitation results in contract negotiations or the transaction of business." *Shute v. Carnival Cruise Lines,* 897 F.2d 377, 381 (9th Cir.1990) (citing *Sinatra v. Nat'l Enquirer, Inc.,* 854 F.2d 1191, 1195 (9th Cir.1988) and *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 840 (9th Cir.1986)), *rev'd on other grounds,* 499 U.S. 585, 111 S.Ct.

1522, 113 L.Ed.2d 622 (1991).[3] The fundamental problem with SAM's argument that Knoedler purposefully availed itself of the benefits of Washington law by soliciting business in this state is that Knoedler did not solicit the transaction at issue here, namely the sale of L'Odalisque. The Bloedels saw it when they were browsing in Knoedler's New York gallery and initiated this particular transaction on their own.

■■■■ SAM asserts that Knoedler's contacts with the Bloedels prior to the 1954 purchase of L'Odalisque somehow constituted solicitation of this transaction. Such contacts, which are unrelated to the transaction giving rise to SAM's alleged injury, cannot be the basis for the exercise of specific jurisdiction in this contractual context. *See Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica,* 614 F.2d 1247, 1254 (9th Cir.1980) (although defendant's agents had previously entered the forum state to sign contracts with plaintiff, the court found "the crucial fact to be that [that] visit pertained only to transactions not at issue in this case" and declined to exercise jurisdiction).[4]

SAM further asserts that the two letters Knoedler sent encouraging the Bloedels to approve and finalize the sale of L'Odalisque constituted solicitation of the transaction at issue in this litigation. Looking at the course of conduct as a whole, however, these "efforts to close the deal," as SAM calls them, were nothing more than part of the negotiations initiated by the Bloedels in New York. The transaction at issue was already in the works—the letters were intended to complete, not solicit, the transaction. The fact that the Bloedels had taken possession of the painting in Washington, necessitating communications through the mails to finalize the deal, does not appear to be the type of solicitation discussed in the case law and would be a very thin reed on which to exercise jurisdiction. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (in a tort action, purchaser's unilateral act of bringing defendant's product into the forum is an insufficient basis for the exercise of personal jurisdiction over the defendant); *Gray & Co. v. Firstenberg Mach. Co., Inc.,* 913 F.2d 758, 760–61 (9th Cir.1990) (in a contract action, contacts with forum consisting of phone calls, letters, and receipt of payment regarding transaction initiated by plaintiff "fall in the category of 'attenuated contacts' insufficient in themselves to establish defendants have purposefully availed themselves of the benefits and protections of the forum's law.").

There is no evidence from which to conclude that Knoedler's solicitation of other transactions, either before or after 1954, resulted in the sale of L'Odalisque. Further, no case law exists to support SAM's assertion that letters exchanged in furtherance of an already pending transaction constitute "solicitation" of the type that could be considered purposeful availment. Thus, SAM's claims regarding Knoedler's solicitation of the sale of L'Odalisque do not establish personal jurisdiction over Knoedler.

### 2. Consignment and Future Consequences

■■■■ A defendant purposefully avails himself of the benefits of the forum if he has deliberately "engaged in significant activities within a State or has created 'continuing obligations' between himself and the residents of the forum." *Burger King,*

3. Although the continued viability of the *Shute* personal jurisdiction analysis was questioned in *Omeluk,* 52 F.3d at 271, the Ninth Circuit has since confirmed that analysis. *See Doe v. American Nat'l Red Cross,* 112 F.3d 1048, 1052 n. 7 (9th Cir.1997).

4. General solicitation within a state, such as advertising or seminars, may be sufficient contacts to establish jurisdiction over a tort claim, as opposed to a contract claim, where those solicitations were the means by which the parties were brought within the "tortious striking distance" of each other. *See Shute,* 897 F.2d at 386 (defendant's solicitation of business within Washington attracted plaintiffs to the cruise on which plaintiff-wife was injured).

471 U.S. at 475–76, 105 S.Ct. 2174 (citations omitted). The mere existence of a contract is insufficient to justify the exercise of jurisdiction over a foreign defendant: the relationship between the forum and the course of negotiations, the terms of the contract, and the anticipated future consequences are the factors to be considered. *Burger King,* 471 U.S. at 479, 105 S.Ct. 2174.

SAM asserts that Knoedler entered into two contracts with regards to the sale of L'Odalisque, the first of which, the 9/28/54 consignment, anticipated future actions in Washington by the Bloedels (the Bloedels were either to approve the painting and remit payment to Knoedler or to reject the painting and return it to Knoedler). Thus, SAM argues, Knoedler entered into a contract that contemplated future consequences within Washington, justifying the exercise of jurisdiction under the analysis of *Roth v. Garcia Marquez,* 942 F.2d 617 (9th Cir.1991) (despite the fact that plaintiff had initiated the contract and most of the negotiations and other contacts had occurred outside the forum, jurisdiction over defendant was proper where the contract contemplated that most of the work would be performed within the forum).

SAM's approach seems overly formalistic, however, and does not comport with the "economic reality" of the transaction. *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1398 (9th Cir.1986). It seems clear from the documents and the context of the negotiations that the parties intended a single transaction, namely the sale of L'Odalisque from Knoedler to the Bloedels. The fact that two documents had to be signed to finalize the agreement, the first of which anticipated the signing of the second, does not mean that there were two transactions. The 9/28/54 letter was merely a step in a single process. An observer would be hard pressed to say that Knoedler transacted two pieces of business in these circumstances, and separating them for purposes of finding some contemplated future consequences, as required by *Roth,* seems illogical.[5] This is, in fact, the "one-shot deal" the *Roth* court described as an example of a contract that would not justify the exercise of jurisdiction: "This is not an instance where the contract was a one-shot deal that was merely negotiated and signed by one party in the forum; on the contrary, most of the future of the contract would have centered on the forum."

### 3. Contracting with Washington Residents

In the context of a sale of goods, the rule in the Ninth Circuit is that knowledge that a contractual partner resides in a particular state and will in all likelihood bring the goods to the forum state is insufficient. *Gray,* 913 F.2d at 761 (holding that "foreseeability of injury in the forum does not in itself establish purposeful availment."). In *Gray,* the plaintiff, a resident of Oregon, contacted a California company to see if they had, or knew of, an available filter. The California company tracked down a filter in Illinois, represented that it was operable, and completed the sale "as is." It turns out the filter was not operable, but when Gray tried to sue defendant in Oregon, the court found no jurisdiction:

> Gray argues because Firstenberg knew Gray was in Oregon and Gray would bring the filter to Oregon, Firstenberg should have anticipated being sued in Oregon if something went wrong with the filter. As noted above, foreseeability of injury in the forum does not in itself establish purposeful availment.

5. If the Court were to view the consignment and the bill of sale as two separate contracts, either one of which could provide a basis for jurisdiction, the 9/28/54 contract on which SAM bases its jurisdictional argument is not the one that gives rise to SAM's cause of action. Thus, under the *Thos. P. Gonzalez* analysis discussed above, that contract would not be considered at all. The only remaining contract would be the 11/11/54 bill of sale, which contemplated absolutely no future actions on the part of either party.

*Gray,* 913 F.2d at 761. Thus, the mere fact that Knoedler was contracting with Washington residents does not establish purposeful availment.[6]

### 4. Combined Contacts

As discussed above, none of the three types of contacts identified by SAM (the solicitations, the sale of the painting, or the knowledge that the purchasers were from Washington), *individually* warrant this Court's exercise of jurisdiction over Knoedler under Ninth Circuit law. The question then becomes whether, in combination, those contacts reach the level of purposeful availment.

■ The evidence produced by SAM clearly shows that during the relevant time period, Knoedler was making a deliberate effort, through ads in national magazines and individual contact with the Bloedels, to gain name recognition throughout the country and, specifically, to become the Bloedels' personal art dealer. Although it is clear from the record that it was the Bloedels who initiated the transaction that gave rise to this litigation, Knoedler made every effort, including visits to the Bloedels' home on Bainbridge Island, to satisfy the Bloedels' art needs and to maintain a relationship with them in Washington.

■ The centerpiece of the jurisdictional analysis for contract claims, however, is the circumstances surrounding the negotiation, signing, and performance of the contract itself. The surrounding relationship of the parties is not generally considered in the Ninth Circuit's analysis. *See Thos. P. Gonzalez,* 614 F.2d at 1254 (three and a half year relationship between the parties encompassing 15 prior transactions would not be considered when determining whether defendant's actions with regard to the 16th contract constituted purposeful availment). SAM's attempts to

focus the analysis on contacts that are not related to the sale of L'Odalisque could be successful only if SAM tied those contacts to this transaction. SAM has not made such a showing. As the factual record is presented in the pleadings, it is just as likely that the Bloedels went to Knoedler's gallery because of their daughter's acquaintance with one of the employees there and not because of Knoedler's national ads or the letters the Bloedels had previously received. In the absence of even a bare assertion of cause and effect, there is no evidence to support the conclusion that it was Knoedler's forum-related activities that resulted in the Bloedels' purchase of L'Odalisque. Thus, SAM has not made a prima facie showing that it was anything other than a whim of the Bloedels that resulted in this particular transaction, and the mere fact that Knoedler was willing to complete a sale of goods initiated by a Washington resident does not justify the exercise long-arm jurisdiction.

### B. Tort Claims

■ The crux of SAM's tort claims is that Knoedler lied, either intentionally or negligently, to get the Bloedels to keep the L'Odalisque. According to the Supreme Court, the jurisdictional analysis with regards to tort claims may consider the effects of foreign acts within the forum. *See, e.g., Calder v. Jones,* 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). The purposeful availment analysis has been expanded in the tort context to permit the exercise of jurisdiction when the claimant makes a prima facie showing of "(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—

---

6. At one point, SAM makes the argument that because Knoedler could have sought enforcement of its contract with the Bloedels in Washington's courts, it had thereby purposefully availed itself of the protections and benefits of Washington law. While that argument would provide a very bright line, it proves too

much and flies in the face of the many cases that hold that the mere existence of a contract with a resident of the forum is an insufficient basis for jurisdiction. *See, e.g., Burger King,* 471 U.S. at 478, 105 S.Ct. 2174; *Roth,* 942 F.2d at 621.

in the forum state." *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1321 (9th Cir.1998) (citing *Core–Vent Corp. v. Nobel Ind. AB,* 11 F.3d 1482, 1486 (9th Cir. 1993)).

With regard to SAM's allegations of intentional tort, a prima facie case for jurisdiction has been established: Knoedler is accused of intentionally lying to the Bloedels, residents of Washington, knowing that if the Bloedels acted on those lies, they would suffer injury within Washington. The claim presented by SAM arises out of the alleged tort: SAM has alleged, with some documentary support, that it was Knoedler's lies regarding ownership of the Matisse that caused the Bloedels to retain possession of the painting. Assertion of jurisdiction over Knoedler would be reasonable in these circumstances and Knoedler had not made a compelling case for not exercising jurisdiction in these circumstances.[7] Thus, this Court may force Knoedler to defend SAM's intentional tort claims without violating defendant's due process rights.[8]

### C. Effect of Factual Disputes on Jurisdictional Analysis

Knoedler asserts that SAM has failed to make a prima facie showing of jurisdiction because it has not shown (1) that it has succeeded to the claims of the Bloedels with regard to L'Odalisque or (2) that the Bloedels had a right to rescind the already-completed sale of L'Odalisque at the time they received the allegedly fraudulent letter of 12/21/54. Both of these arguments, however, challenge the underlying factual and legal merits of SAM's claims: they do not negate or otherwise lessen the quality and nature of the jurisdictional contacts alleged.

The three-prong jurisdictional analysis used in the Ninth Circuit does not allow for challenges to the underlying merits when determining the Court's jurisdiction. Once purposeful availment and but for causation is shown, jurisdiction will lie unless fairness dictates otherwise. Knoedler attempts to use the asserted weaknesses in SAM's underlying case to bolster its arguments that the exercise of jurisdiction would be constitutionally unfair. If SAM's legal theory of the case is incorrect, however, a motion to dismiss based on lack of standing or a motion for summary judgment based on contractual rights is the appropriate way to bring such issues before the Court.

### CONCLUSION

SAM's third-party complaint alleges four causes of action against Knoedler: (1) breaches of implied warranties; (2) fraud; (3) negligent misrepresentation; and (4) implied equitable indemnity. Pursuant to the above analysis, SAM has failed to establish jurisdiction over its contract claim (Count 1) and its negligent misrepresentation claim (Court 3), but has met its burden with regard to its intentional tort claim (Count 2) and what is essentially a claim for damages related to that tort (a portion of Count 4).

According to the Ninth Circuit, where jurisdiction will lie over one claim, "it may or may not be appropriate to assume jurisdiction over the other claim under principles analogous to the doctrine of pendent jurisdiction." *Data Disc,* 557 F.2d at 1288 n. 8. The Court finds that exercising jurisdiction over all of SAM's claims against Knoedler would promote

7. Knoedler points out that it may not be able to bring the Paris gallery that sold it L'Odalisque into this litigation or to compel the presence of certain witnesses who may be helpful to their defense. Should it lose in this case, Knoedler argues that it will have to file a subsequent action in New York against the original sellers, thereby risking inconsistent verdicts. While that risk no doubt exists, it would simply be shifted to SAM if the Court were to dismiss Knoedler from this action. The equities of that argument favor neither Knoedler or SAM.

8. Although SAM states that both its fraud and negligent misrepresentation claims support a finding of jurisdiction, it appears that only an intentional, not a negligent, tort can satisfy the Ninth Circuit's effects test.

the interests of justice and the efficient use of the parties' and the Court's resources. Should Knoedler ultimately convince the Court that SAM's intentional tort claim fails as a matter of law, however, there would be no justification for retaining jurisdiction over the remaining claims.