Kent J. Dawson, United States District Judge
Presently, the Court has before it Defendant OSI Collection Services, Inc.'s *959 ("Defendant") Motion to Dismiss or, alternatively, Motion for Summary Judgment (# 4). Plaintiff filed a response (# 8) as well as an affidavit (# 9) in opposition. Defendant filed a reply (# 10).[2]
Also before the Court is Plaintiff's Motion for Leave of Court to File Second Amended Complaint (# 15). Defendant filed a response in opposition (# 16), to which Plaintiff replied (# 17).
I. Background.
Plaintiff, a self-proclaimed consumer advocate, filed his original complaint on March 2, 2004, and then filed his Amended Complaint on March 29, 2004, before Defendant had filed a responsive pleading. In the Amended Complaint, Plaintiff alleges causes of action based on the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 - 1692o and on state law. Plaintiff predicates his claims upon Defendant's efforts to collect a debt from him in March 2003. On May 12, 2003, Defendant and related companies filed for Chapter 11 bankruptcy protection. On October 15, 2003, the bankruptcy court entered its Order Confirming Debtors' Amended and Restated Joint Plan of Reorganization, as Modified, and confirmed Debtor's Third Amended and Restated Joint Plan of Reorganization, as Modified. In its Notice of Confirmation of Debtors' Third Amended Plan of Reorganization Notice and Related Matters, the bankruptcy court specifically provided that the provisions of the Plan bound any holder of a claim and that debtors (which included the instant Defendant) were discharged by operation of Section 1141 of the Bankruptcy Code from any and all debts and claims that arose against them before the date of entry of the Confirmation Order.
On March 19, 2004, Defendant was served Plaintiff's complaint. On March 22, 2004, Counsel for Defendant mailed Plaintiff a letter reminding him of the Confirmation of the Chapter 11 Reorganization Plan and requested him to voluntarily dismiss his complaint. On March 24, 2004. Plaintiff acknowledged receipt of the letter and advised that he would not dismiss his complaint. After talking with Plaintiff, Defendant's counsel sent another letter setting forth Defendant's position that Plaintiff was in violation of the injunction of 11 U.S.C. § 524 and again requested that Plaintiff dismiss his complaint against the Defendant. On March 29, 2004, Plaintiff filed an Amended Complaint in which he expressly states that he waives any recovery of damages against the Defendant. However, in the second paragraph of the Amended Complaint, Plaintiff expressly states that "This Amended Complaint is not to be interpreted, construed, or accepted as any agreement or conclusion, by Plaintiff, to dismiss OSI from this action."
II. Analysis.
A dismissal for failure to state a claim pursuant to Rule 12(b)(6) is a ruling on a question of law. See Clegg v. Cult Awareness Network, 18 F.3d 752, 754 (9th Cir. 1994). In reviewing a Rule 12(b)(6) motion, the Court "must construe the complaint in the light most favorable to the plaintiff and must accept all well-pleaded factual allegations as true." Shwarz v. United States, 234 F.3d 428, 435 (9th Cir. 2000). Review is limited to the contents of the complaint. See *960 Sprewell v. Golden State Warriors, 231 F.3d 520, 527 (9th Cir. 2000). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. See id. The court is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. See Clegg, 18 F.3d at 754-55. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. See Sprewell, 266 F.3d at 988. If a matter outside the pleadings is considered, the court should treat the motion as one for summary judgment. See Fed. R. Civ. P. 12(c).
Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any. show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c) ; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party to set forth specific facts demonstrating a genuine factual issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ; Fed. R. Civ. P. 56(e). All justifiable inferences must be viewed in the light must favorable to the nonmoving party. See Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. However, the nonmoving party may not rest upon the mere allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials provided by Rule 56(c), showing there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment shall not be granted if a reasonable jury could return a verdict for the nonmoving party. See id. at 248, 106 S.Ct. 2505.
A. Defendant's Motion to Dismiss (# 4).
In its motion, Defendant argues that Plaintiff's claims are barred by the bankruptcy discharge. The effect of confirmation pursuant to 11 U.S.C. § 1141 is to bind a creditor to the provisions of the confirmed plan. See 11 U.S.C. § 1141(a). Moreover, the confirmation of a plan discharges the debtor from any debt that arose before the date of such confirmation. See id. § 1141 (d)(1). A creditor is defined as one who has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor. See id. § 101 (10)(A). A claim is defined, among other things, as a right of payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. See id. § 101(5)(A). A debt means liability on a claim. See id. § 101(12). Once a debtor is discharged, this discharge operates as an injunction against the commencement or continuation of an action, the employment of process, or an act to collect or recover a discharged debt. See id. § 524(a)(2).
In order for a creditor to retain its claim against the bankrupt, it must generally file a proof of claim during the bankruptcy proceedings. See Perez v. Cumberland Farms, Inc., 213 B.R. 622, 623 (D. Mass. 1997). Also, all creditors in a Chapter 11 proceeding who hold contingent, unliquidated, or disputed claims are required to file a proof of claim with the bankruptcy court by the deadline or "bar *961 date" set by the court. See 11 U.S.C. § 1111 ; Bankr. R. 3003(c)(2). If a creditor fails to file a proof of claim, § 524(a) shields the debtor from that creditor. See Perez, 213 B.R. at 623 ; see also In re White Motor Credit, 761 F.2d 270, 275 (6th Cir. 1985) ("All pre-petition claims and post-petition claims against White which have not been filed with the Bankruptcy Court are barred by the statute and the orders of the lower courts."). However, courts have held that claimants may proceed with claims against a debtor for the purpose of collecting from the debtor's liability insurer. See Perez, 213 B.R. at 623 (citing several cases); see also 11 U.S.C. § 524(e). These courts reason that § 524(a) discharges only the debtor's personal liability, not the liability of any other party such as the debtor's insurer. See Perez, 213 B.R. at 623.
Here, the factual predicates of Plaintiff's claims arose in March 2003. These claims clearly occurred before the bankruptcy court entered the Confirmation Order. Moreover, Plaintiff never filed a required proof of claim, nor has he sought to reopen the bankruptcy case in order to modify the permanent injunction to allow a claim against Defendant's insurer. Accordingly, Plaintiff is barred from going forward against Defendant.
Even if Plaintiff were allowed to proceed nominally against Defendant for the sole purpose of potentially reaching Defendant's insurer his claims fail. In his Amended Complaint, Plaintiff expressly waives any recovery from Defendant. In his Affidavit, Plaintiff states that if he is the prevailing party, he will limit recovery against Defendant to insurance proceeds and, further, that he will not seek enforcement of a judgment as against Defendant. While such language would typically allow Plaintiff to proceed, he cannot reach Defendant's insurer. Under its policy of insurance, Defendant is responsible, under a retention provision, for the initial sum of $ 100,000 for each wrongful act resulting in a claim, other than a class action claim. Plaintiff brings his suit under the FDCPA and chapters 598 and 649 of the Nevada Revised Statutes. Plaintiff seeks from Defendant statutory damages of $1,000 under the FDCPA and punitive damages of $25,000 under the Nevada Revised Statutes. The maximum recovery Plaintiff could recover from Defendant is $26,000 which would not allow him to recover from Defendant's insurer. Accordingly, there is no proper reason for him to continue against Defendant.[3]
B. Plaintiff's Motion for Leave of Court to File Second Amended Complaint (# 15).
In his motion, Plaintiff seeks leave to file a Second Amended Complaint in order to add Mr. Shannon as a defendant. Even though Mr. Shannon neither made or participated in the telephone calls nor signed or sent the collection notices alleged to violate the FDCPA, Plaintiff contends that Mr. Shannon is still a debt collector for FDCPA purposes because he is a compliance officer for Defendant. Plaintiff maintains that Mr. Shannon has an extremely high level of involvement in Defendant's debt collection practices and activities and is highly involved in creating, approving and ratifying the debt collection *962 practices, policies and procedures utilized by Defendant, its employees and its representatives.
Rule 15(a) of the Federal Rules of Civil Procedure allows a plaintiff to amend the complaint once, as a matter of right, prior to the filing of a responsive pleading. See Fed. R. Civ. P. 15(a). Once the complaint has been amended, a plaintiff must then seek leave of court or written consent of the adverse party before further amendment may be made. See id. The Court shall grant leave to amend "when justice so requires." Id. The Court must be guided by Rule 15's underlying purpose: to facilitate decision on the merits, rather than on the pleadings or technicalities. See Roth v. Garcia Marquez, 942 F.2d 617, 628 (9th Cir. 1991). The Court is instructed to apply with extreme liberality Rule 15's policy of favoring amendments to pleadings. See id. In determining whether to grant a motion to amend, the Court should consider the following factors: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party. See Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 986 (9th Cir. 1999). However, the Court's "discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." Allen v. City of Beverly Hills, 911 F.2d 367, 373 (9th Cir. 1990) (quoting Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989) ).
The Court finds that Plaintiff is not entitled to Rule 15 relief. First, the Court finds undue delay in Plaintiff seeking to file a Second Amended Complaint. In requesting Rule 15 relief, Plaintiff attached the deposition of Mr. Shannon from one of Plaintiff's many lawsuits. This deposition occurred in April 2003. Thus, Plaintiff knew of Shannon's activities almost one year before he filed his original Compliant in early March 2004. Thus, there is no excuse for Plaintiff not naming Shannon in either his original or Amended Complaint, Second, the Court finds the Plaintiff's actions are based on bad faith. Realizing that his complaint will be dismissed due to the § 524(a) discharge and that he has failed to serve the other individual Defendants in the time frame set out in Rule 4(m) of the Federal Rules of Civil Procedure,[4] Plaintiff has now sought to salvage his complaint by finding any employee of Defendant to name as a defendant. Coupled with the fact that Plaintiff knew of Shannon's activities well before he filed the instant action, these acts establish bad faith.[5]
*963 C. Attorneys' Fees.
In its motion to dismiss, Defendant seeks attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3). This section provides, in part: "On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs." The Court finds that Plaintiff's case was brought in bad faith and for the purpose of harassment. After Plaintiff filed his complaint, Defendant's counsel advised him of Defendant's bankruptcy and requested voluntary dismissal. Plaintiff refused and insisted in advancing his claims notwithstanding the discharge. Most likely, Plaintiff brought this complaint in the hope of demanding a payment in exchange for the dismissal of this litigation. Plaintiff's past court experiences support this finding as Plaintiff is no stranger to litigation under the FDCPA. A review of the Court's records reveals that Plaintiff has instigated at least 45 actions in this Court alone.[6] In these cases, Plaintiff brought claims pursuant to the FDCPA, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 - 1681u, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691 - 1691(f), among others.[7] In addition to these legal *964 actions, Plaintiff has also reached monetary settlement in more than 20 claims without needing to file suit.[8] In a previous deposition, Plaintiff testified that he made a living by suing companies pursuant to the FDCPA, FCRA, and ECOA.[9] Plaintiff *965 also testified that his basic practice is to allege a violation of one or more of the federal acts and make an initial demand of $7,500.00 to settle the case.[10] Plaintiff used this practice even when the debt was only a $32 bill from MCI.[11] In fact, Plaintiff testified that in 2001 he received settlements of approximately $25,000 in five case by sending just his demand letter.[12] Rather than being the most harassed debtor in Clark County, Plaintiff's many lawsuits indicates his tactic of harassment.[13] *967 Thus, the Court will award Defendant reasonable attorney's fees and costs.
D. Conclusion.
Accordingly, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss or, alternatively, Motion for Summary Judgment (# 4) is GRANTED . Plaintiff's Amended Complaint is DISMISSED as to all Defendants.
IT IS FURTHER ORDERED that Plaintiff's Motion to Strike Defendant's Reply to Motion to Dismiss, or in the Alternative, Plaintiff's Motion to File Surreply (# 12) and Plaintiff's Motion for Leave of Court to File Second Amended Complaint (# 15) are DENIED .
It is further ordered that Defendant's demand for attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3) is GRANTED . Defendant shall have fifteen days from the entry of this order to file its schedule of attorney's fees and costs.

The Court also has before it Plaintiff's Motion to Strike Defendant OSI's Reply to Motion to Dismiss, or in the Alternative, Plaintiff's Motion to File Surreply (# 12). Defendant filed a response in opposition (# 13), to which Plaintiff replied (# 14). After having read and considered Plaintiff's Motion to Strike, as well as the accompanying filings, and good cause lacking, the Court will deny the motion.

Based on a document attached to his Motion to Strike, Plaintiff alleges that Defendant only had a $10,000 deductible. The Court finds Plaintiff's allegation meritless. First, the insurance document Plaintiff attaches states that it applies to "OSI Holding Corporation" which is not the named Defendant. Second, the policy period for the $10,000 deductible was from the period December 31, 1999 through December 31, 2002. Because the events alleged in Plaintiff's Amended Complaint occurred in 2003, this insurance policy is irrelevant.

The Court will dismiss Plaintiff's Amended Complaint as to the individually named Defendants for failure to serve them.

Additionally, the Court finds that Plaintiff's amendment may well be futile. The Court finds persuasive Defendant's citation to White v. Goodman, 200 F.3d 1016, 1019 (7th Cir. 2000) and Pettit v. Retrieval Masters Creditor Bureau, Inc., 211 F.3d 1057, 1059 (7th Cir. 2000) ("Because such individuals do not become 'debt collectors' simply by working for or owning stock in debt collection companies, we held that the [FDCPA] does not contemplate personal liability for shareholders or employees of debt collection companies who act on behalf of those companies, except perhaps in limited instances where the corporate veil is pierced."). The cases Plaintiff cites address personal liability under the FDCPA for presidents, directors, sole shareholders, general partners and owners of debt collection companies, and then, in some cases, only if the corporate veil has been pierced. Plaintiff states in his moving papers that Shannon is not a president, director, or officer of Defendant, thus undermining his argument based on these cited cases. Furthermore, the courts have not specifically addressed whether an employee who neither talked to the debtor nor sent a letter to the debtor is still liable under the FDCPA based solely on his employment. Based on Defendant's cited cases, the Court would not find such an employee liable under the FDCPA.

The Court arrived at this number by reviewing its electronic database and entering the Plaintiff's name as a search criterion. Moreover, at his deposition that occurred on April 25, 2002, Plaintiff testified that beginning from the early 1990s up until his deposition, he had filed around 32 cases in the District of Nevada. See Dep. of Paul D.S. Edwards taken April 25, 2002, at 24-25 [hereinafter "Edwards Dep."]. This deposition is attached as Ex. A to Heard Resp. to Pl.-Counterdef.'s Voluntary Dismiss. & Countermot. for Dismiss. with Prejudice & for Summ. J. On Heard's Countercl. (# 31, 32), Edwards v. Bill Heard Chevrolet Corp., No. CV-S-01-1171-PMP (PAL), 2002 WL 32978813 (D. Nev. filed June 19, 2002) [hereinafter "Heard Resp. (# 31, 32)"].

See, e.g., Edwards v. Wal-Mart Stores, Inc., No. CV-S-04-1210-HDM (RJJ) (D. Nev. March 9, 2005) (FCRA); Edwards v. OSI Collection Servs., Inc., No. CV-S-04-1160-JCM (PAL) (D. Nev. Jan. 27, 2005) (FDCPA); Edwards v. M.R.S. Assocs., Inc., No. CV-S-03-0788-JCM (PAL) (D. Nev. Nov. 6, 2003) (FDCPA); Edwards v. FMA Alliance Ltd., CV-S-03-0236-RLH (RJJ) (D. Nev. Feb. 6, 2004), aff'd sub nom, Edwards v. Davis, 120 Fed.Appx. 743 (9th Cir. 2005) (unpublished) (FDCPA); Edwards v. Viking Collection Serv. Southwest, Inc., No. CV-S-03-0222-JCM (PAL) (D. Nev. May 23, 2003) (FDCPA); Edwards v. Diversified Credit Servs., Inc., No. CV-S-02-1040-HDM (RJJ) (D. Nev. Jan. 15, 2004) (FDCPA); Edwards v. OSI Portfolio Servs., Inc., No. CV-S-02-1039-LRH (PAL) (D. Nev. Aug. 16, 2004) (FDCPA & FCRA); Edwards v. Lender's Credit, No. CV-S-02-1038-LDG (RJJ) (D. Nev. Feb. 14, 2003) (FRCA); Edwards v. Bill Heard Chevrolet Corp., No. CV-S-01-1171-PMP (PAL) (D. Nev. Feb. 9, 2004) (ECOA); Edwards v. Capital One, No. CV-S-01-1170-LRH (PAL) (D. Nev. Jan. 25, 2002) (ECOA), aff'd, 46 Fed.Appx. 560 (9th Cir. 2002) (unpublished); Edwards v. Transworld Sys., Inc., No. CV-S-01-1146-KJD (LRL) (D. Nev. Dec. 12, 2001) (FDCPA); Edwards v. Collectech Sys., Inc., No. CV-S-01-0776-PMP (PAL) (D. Nev. Oct. 2, 2001) (FDCPA & FCRA); Edwards v. Coldata, Inc., No. CV-S-01-0725-HDM (PAL) (D. Nev. Oct. 15, 2001) ("FDCPA"); Edwards v. G C Serv., No. CV-S-01-0697-PMP (PAL) (D. Nev. Nov. 5, 2001) (FDCPA); Edwards v. Outsourcing Solutions, Inc., No. CV-S-00-1062-LDG (LRL) (D. Nev. Jan. 17, 2001) (FDCPA); Edwards v. Lakeside Info. Res., No. CV-S-00-0863-DWH (RJJ) (D. Nev. Oct. 5, 2000) (FCRA); Edwards v. Pierce, Hamilton & Stern, Inc., No. CV-S-00-0862-KJD (RJJ) (D. Nev. Sept. 8, 2000) (FCRA); Edwards v. NCO Group, Inc., No. CV-S-00-0782-DWH (LRL) (D. Nev. Sept. 19, 2000) (FDCPA); Edwards v. Peelle Fin. Corp., No. CV-S-00-0057-HDM (LRL) (D. Nev. Aug. 4, 2000) (FDCPA); Edwards v. Dale W. Rhoades Enter., Inc., No. CV-S-00-0056-KJD (RJJ) (D. Nev. July 20, 2000) (FDCPA) Edwards v. Stock, No. CV-S-00-0040-RLH (RJJ) (D. Nev. Jan. 31, 2001) (FDCPA), aff'd, 45 Fed.Appx. 823 (9th Cir. 2002) (unpublished); Edwards v. Beatty, No. CV-S-99-1661-KJD (RLH) (D. Nev. June 27, 2000) (FDCPA), aff'd, 18 Fed.Appx. 668 (9th Cir. 2001) (unpublished); Edwards v. 360° Communications, No. CV-S-98-1493-PMP (RJJ) (D. Nev. Nov. 17, 1999) (ECOA), aff'd, 19 Fed.Appx. 541 (9th Cir. 2001) (unpublished); Edwards v. Sprint, Inc., No. CV-S-97-0699-HDM (RLH) (D. Nev. Oct. 16, 1997) (FCRA & ECOA), aff'd, 156 F.3d 1236 (9th Cir. 1998) (unpublished).

In his April 25, 2002 deposition, Plaintiff testified as follows:
Q. (Mr. Clark) And that is really what I'm looking for you to give me. How many of those claims were there that you resolved without having to file a lawsuit?
A. (Mr. Edwards): I'm saying two. There could have been four.
Q. Well, I'm going beyond 1990-excuse me, 2001 now.
A. You are going to where?
Q. I'm going back to the 1991, 1992 time frame that we had established earlier.
A. There could have been 20.
Q. That did not result in a lawsuit?
A. That did not result in a lawsuit. Now to clarify that, are you saying companies that I've sent letters to that I have settled with for a monetary settlement?
Q. Well, that is my next question. You have resolved claims that haven't resulted in a lawsuit.
A. By resolved you mean-
Q. The claim no longer exists. Either you dropped it or you settled it.
A. Okay.
Q. The next question is: How many of those approximately 20 actually resulted in a monetary award to you?
A. To clarify, again not being evasive, there were probably more than 20 that were resolved. There were probably 20 that were resolved for moneys.
Q. Okay.
A. And it is possible there could have been more than 20.
Edwards Dep. at 31-32 (emphasis added).

In his April 25, 2002 deposition, Plaintiff testified as follows:
Q. (Mr. Clark) Prior to February of this year [2002], where were you employed?
A. (Mr. Edwards) My last place of employment would have been in Denver, I believe 1986, for a Jeep dealership. I can't remember their name.
Q. What has been your source of income since 1986?
A. I sue companies.
Q. What do you mean by that?
A. I sue usually collection companies. If I get a letter and I don't believe it complies with my rights that I'm allowed under the law, the disclosures that they are supposed to give me, normally I would send them a demand letter. There are times when I just call them up and speak with them. And if that doesn't work, then I'll file an action, usually in Federal Court.
Id. at 15 (emphasis added).
The prior testimony of Pamela Wall also supports the conclusion that Plaintiff makes a living suing companies. In her March 20, 2002 deposition taken in regard to Edwards v. Bill Heard Chevrolet Corp., No. CV-S-O1-1171-PMP (PAL) (D. Nev. Feb. 9, 2004), Pamela Wall testified to the following:
Q: (Mr. Friedberg) So you brought the credit application over to Mr. King?
A: (Ms. Wall) Right.
Q: He then told you to go back and get Mr. Edwards'-
A: Yes.
Q: -signature on the credit application. You asked for Mr. Edwards to sign it and he did?
A: Yes.
Q: And then what?
A: Actually, when I gave it to him, I gave it to him and told him what I wanted, and I said and he sues for a living. And he said you need a signature on this, you'd better watch this old boy.
Q: Who said that?
A: John King.
Q: Did Mr. King know Mr. Edwards?
A: No. Just because-he said consumer-self-appointed consumer advocate, and I said yes, he sues for a living. And just get-sue for a living-
Q: Oh, you told Mr. King that?
A: Yes.
Q: Oh, Okay.
A: That's what Mr. Edwards told me when I had said self-appointed consumer advocate. He said I teach people to sue, I sue for a living, that's what I do.
Q: Okay. And so Mr.-and I just got a little confused as to who was saying what to whom. Mr. King then told you what?
A: Mr.-well, I gave it to him, he looked at it, told him he sued for a living. He said you need a signature on this credit app, you'd better watch this old boy.
Q: Okay. At that point, did you have any second thoughts about being the salesperson dealing with Mr. Edwards?
A: Yes.
Q: What was your thoughts?
A: Well, he said he sues for a living, and, you know, that people make mistakes. And I-of course, I would be concerned. I was new, I was inexperienced. I didn't want to do something that was technical that was going to create any kind of problem. But, you know, at that point, we-I mean, there wasn't anything to do but present it to the desk. I didn't have authority to do anything but present it to the desk, so-.
Dep. of Pamela K. Wall taken on March 20, 2002, at 53-56 (emphasis added) [hereinafter "Wall Dep."]. This deposition is attached as Ex. 1 to Edwards Mot. For Summ. J. (# 34), Edwards v. Bill Heard Chevrolet Corp., No. CV-S-01-1171-PMP (PAL) (D. Nev. filed July 1, 2002).

In his April 25, 2002 deposition, Plaintiff testified as follows:
Q: (Mr. Clark) What does your demand letter typically say?
A: (Mr. Edwards) It says that I believe they have sent-pursuant to Federal Rules of Evidence 408, I'm alleging that they violated various sections of the Fair Debt Collection Practices Act, sections of our state statutes. I go into what I believe they did wrong, their violation, what it is based upon. And my normal demand is for $7500. I do give them generally two, three, four weeks to respond.
Q: Generally, your demand is for $7500?
A: Yes.
Q: Did you make a demand to this collection agency relative to the MCI bill?
A: Yes.
Edwards Dep. at 17-18 (emphasis added).

See id. at 16, 18.

In his April 25, 2002 deposition, Plaintiff testified as follows:
Q: (Mr. Clark) For calendar year 2001, can you tell me how many times this procedure happened where you would get a letter, you would make some calls, send a demand letter, and resolve a claim?
A: (Mr. Edwards) From this collection company?
Q: No. Just in general.
A: We are talking collection companies?
Q: Yes.
A: I'm going to say five times.
Q: Did each of those five times result in a cash settlement?
A: Yes.
Q: And what was the sum amount of those five cash settlements for 2001?
A: I'm going to object to the question. There is no relevance for it in this matter.
Q: Again, relevance is an objection that you maintain at the time of trial. Since you are not a lawyer, I'll explain that for you. Under the federal and state rules for depositions, all of your objections are maintained for trial, except for form of the question and privilege; attorney/client, you know, accountant/client, clergy-penitent. Those are the privileges. There are some others, but those come to mind. And all of the other objections you maintain for trial, but they are not appropriate here at deposition.
A: I'll state my objection. I didn't say I wasn't going to answer the question.
Q: Okay.
A. I would say 25,000.
Q: That is an approximation?
A: That is an approximation.
Id. at 18-20 (emphasis added).

A review of the Court's docket reveals that most of the cases Edwards has filed in this Court have been dismissed by stipulation. See supra note 7. Most likely the cost of litigation was more than Edward's demand. However, Edwards has sued parties who were willing and able to pursue the litigation process. While the Court is unable to evaluate the merits of Edward's claims in those lawsuits that were dismissed early in the progression of the case, a review of the lawsuits that did not settle or that settled after much litigation hints at the general frivolity of his claims. For example, in Edwards v. Capital One, No. CV-S-01-1170-LRH (PAL), Edwards sued Capital One regarding the rejection of his credit card application. See Complaint at 15-19, Edwards v. Capital One, No. CV-S-01-1170-LRH (PAL) (D. Nev. filed Oct. 10, 2001). Edwards sought compensatory as well as punitive damages in the amount of $420,000 because the required Regulation B disclosure language was on the third page of the rejection letter rather than the first page. See id. at 16-19, 26. The Court granted Capital One's motion to dismiss for failure to state a claim because neither the statute nor the regulation specified where the required disclosure statements are to be located. See Edwards v. Capital One, No. CV-S-01-1170-LRH (PAL), slip op. at 4-5 (D. Nev. Jan. 22, 2002), aff'd, 46 Fed.Appx. 560 (9th Cir. 2002) (unpublished). There was never a dispute on whether the written rejection contained the required disclosure statements. See id. at 4. The dispute focused solely on the location of these statements. See id. Additionally, the Court found that Capital One's letter appeared to be based in large part on the notification forms contained in Appendix C with some slight modification. See id. at 4-5.
In Edwards v. Stock, No. CV-S-00-0040-RLH (RJJ), Edwards sued an attorney under the FDCPA. See Edwards v. Stock, No. CV-S-00-0040-RLH (RJJ), slip op. at 2-3 (D. Nev. Jan. 30, 2001), aff'd, 45 Fed.Appx. 823 (9th Cir. 2002) (unpublished). This case focused on Edward's failure to pay his homeowner's association dues and mortgage payments. See id. at 2. Elan Homeowners Association ("Elan") recorded a lien and then published a Notice of Default and Election to Sell. See id. After Elan's attorney published the Notice of Foreclosure Sale, Edwards contacted her office to request a break down of the monies owed. See id. Based on the fax from the attorney's office as well as the Notice of Foreclosure, Edwards brought this suit pursuant to the FDCPA. See id. at 3. The Court granted the attorney's motion for summary judgment finding that she was not a debt collector under the FDCPA and that her communication with Edwards was not covered under the FDCPA. See id. at 5-7. Moreover, finding that Edwards brought the suit in bad faith in an effort to intimidate and harass, the Court awarded attorney's fees. See id. (D. Nev. April 2, 2001) (order granting attorney's fees but denying certain costs).
Edward's most egregious case appears to be Edwards v. Bill Heard Chevrolet Corp., No. CV-S-01-1171-PMP (PAL) (D. Nev. Feb. 9, 2004). In this action, Edwards alleged that when he entered the premises of Bill Heard Chevrolet on August 27, 2001, he intended to purchase a new Corvette. See Complaint at 11, Edwards v. Bill Heard Chevrolet Corp., No. CV-S-01-1171-PMP (PAL), 2001 WL 34881281 (D. Nev. filed Oct. 10, 2001) [hereinafter "Bill Heard Chevrolet Complaint"]. Despite having no lawful employment for the previous fifteen years, having recently experienced a bankruptcy and foreclosure action, and having previously worked in the automobile sales industry, see Edwards Dep. at 15, 41; Wall Dep. at 56, 59, 69, Edwards "believed" he would qualify for a lease of $500/month payment with $2,500 down, see Bill Heard Chevrolet Complaint at 13 n.7 ("EDWARDS' initial offer was for financing with $2,000.00 down, and payments of $500.00 a month."); see also Edwards Dep. at 45, 91 ("A: She asked me how much I wanted to put down. I said I would like to keep it at $2,000. I believe I said I would probably go to 2500. I said I would like my payments to be somewhere around 500 a month for 36 or 48 months."). When such financing was not available, a representative of Bill Heard Chevrolet allegedly notified Edwards of alternative financing with a $10,000 down payment. See Edwards Dep. at 54 ("A: From what I remember, the next phone call was after the Jewish holidays, what they call Yom Kippur. Pam called me and said that, quote, We got you approved with $10,000 down, unquote."); but see Wall Dep. at 76 ("Q: Okay. When you were discussing the possibility of buying a car, did you say that with a 10,000 dollar down payment, he'd be approved? A: Absolutely not. I certainly did not have authority to tell him he would be approved for anything. And we never discussed an amount. The only figure that we ever discussed was that he didn't want his payments to be more than $500 a month. That is the only dollar figure we ever discussed. And then the price of the car was on the invoice. Money amounts, that's it."). Edwards rejected this alleged counteroffer. See Edwards Dep. at 54. A few days after this notification, Edwards filed his complaint. See id.; but see Bill Heard Chevrolet Complaint at 12-13 ("That on or about August 31, 2001, EDWARDS was contacted by a salesperson from DEFENDANTS' location of 444 South Decatur Boulevard, Las Vegas, Nevada, who advised EDWARDS that he was approved for financing with a "down payment" of $10,000.00."). Not until the conclusion of discovery did Edwards state that he based his ECOA claim on the fact Bill Heard Chevrolet had failed to send him an adverse action letter after he had rejected the alleged counteroffer of a $10,000 down payment. See Edwards Dep. at 89-92. Moreover, Edwards's actions since he approached the dealership were indicative that Edwards never desired to purchase a car. From the time he filed his complaint until his deposition in that case, Edwards did not purchase a Corvette nor did he seek to purchase such a car from any other Chevrolet dealer. See id. at 67-77. It was also alleged that Edwards had on two occasions offered to settle his claims against Bill Heard Chevrolet in exchange for a brand new fully loaded, triple black Corvette. See Heard Opp. to Pl.'s Mot. Dismiss Defs.' Countercls. (# 40) at 4, Edwards v. Bill Heard Chevrolet Corp., No. CV-S-01-1171-PMP (PAL) (D. Nev. filed July 15, 2002); see also Letter of Paul D.S. Edwards dated July 8, 2002, at 1 (offering to settle the matter with Bill Heard Chevrolet by either "1. Payment by your client for $35,000.00, plus my fees and cost that I have estimated [to-date] at $6,000.00; or, 2. Payment by your clients of a new 2003 Chevrolet Corvette Convertible (Black / Black, with the equipment as listed in the Vehicle Order Event History ("History"), attached to Wall Dep. As Exhibit 4."); Heard Opp. to Pl.'s Mot. Summ. J. (# 41), at Ex. F, Edwards v. Bill Heard Chevrolet, Corp., No. CV-S-01-1171-PMP (PAL) (D. Nev. filed July 15, 2002).
Based on these three representative examples, Edwards' actions have an appearance of fraud. Collection companies do not randomly call individuals seeking payment of non-existent debts. While it may be understandable to have ten to fifteen debt collection cases since 1991, the fact that Edwards has conservatively had seventy such cases (50 lawsuits filed + 20 cases resolved without litigation) is suspect. Based on the number of cases filed, Edwards is one of the most litigious parties in Southern Nevada. If Edwards purposefully charges purchases knowing that he will not pay them back and then seeks to discharge them through threatened litigation, this may be evidence of criminal fraud that should be forwarded to the United States District Attorney's Office.